UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| OPUS WOODS CONSERVATION ASSOCIATION, and SFI LTD. PARTNERSHIP 54,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>METROPOLITAN COUNCIL,<br><br>　　　　　　　　　　　Defendant. | Case No. 15-1637 (JRT/SER)<br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |

Rob A. Stefonowicz and Gary A. Van Cleve, **LARKIN HOFFMAN DALY & LINDGREN, LTD**, 8300 Norman Center Drive, Suite 1000, Minneapolis, MN 55437, for plaintiffs.

Charles N. Nauen, Kristen G. Marttila, William A. Gengler, and David J. Zoll, **LOCKRIDGE GRINDAL NAUEN P.L.L.P.,** 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, and Ann K. Bloodhart, **METROPOLITAN COUNCIL, OFFICE OF GENERAL COUNSEL**, 390 Robert Street North, Saint Paul, MN 55101, for defendant.

Plaintiffs Opus Woods Conservation Association ("OWCA") and SFI Ltd. Partnership 54 ("SFI") (collectively referred to as "Plaintiffs") bring this action against Defendant Metropolitan Council ("Met Council"). Plaintiffs challenge the Southwest Light Rail Transit Project ("SWLRT"), a proposed light rail transit route that would connect downtown Minneapolis to the southwestern Twin Cities. Plaintiffs allege that Met Council violated the National Environmental Policy Act ("NEPA"); the Department

of Transportation Act, 49 U.S.C. § 303(b) ("Section 4(f)"); and Minnesota Statute § 473.3994 ("Municipal Consent Statute"), by selecting a route and initiating the municipal consent process before final environmental review and without conducting a Section 4(f) analysis of a particular area in Minnetonka. Met Council has moved to dismiss all claims. The Court concludes that Plaintiffs have not pled facts suggesting that Met Council irreversibly and irretrievably committed to the proposed route prior to final environmental review, or undertook some action that effectively limited the alternatives considered during environmental review to the extent of eviscerating any federal remedy. The Court also finds no implied cause of action under Section 4(f). Finally, the Court finds that Met Council did not violate the Municipal Consent Statute. Accordingly, the Court will grant Met Council's motion to dismiss.

Although this action resembles the lawsuit brought against Met Council by the Lakes and Parks Alliance, it is different in one critical respect. In this case, there are insufficient facts pled that Met Council has prematurely, "irreversibly and irretrievably" committed to a certain route. In contrast, the facts pled in *Lakes and Parks Alliance of Minneapolis v. Federal Transit Administration* ("*LPA I*"), 91 F. Supp. 3d 1105 (D. Minn. 2015), suggest that a memorandum of understanding ("MOU") between Met Council and the City of St. Louis Park committed Met Council to a certain route before the necessary environmental review.

# BACKGROUND

## I. OVERVIEW OF PARTIES AND THE SOUTHWEST LIGHT RAIL TRANSIT PROJECT

The instant case involves an area in Minnetonka referred to as Opus Hill. (Compl. ¶ 3, Mar. 30, 2015, Docket No. 1.) OWCA is a non-profit organization comprised of individual members who own property or reside in the Opus Hill area, and who use the recreational areas at issue in this case. (*Id.* ¶ 8.) SFI owns Claremont Apartments, an apartment complex immediately adjacent to the Opus Hill area. (*Id.* ¶ 9.) Met Council is the regional policy-making body and planning agency "responsible for planning, designing, acquiring, constructing and equipping the SWLRT pursuant to the Minnesota Light Rail Transit Statutes." (*Id.* ¶ 10.) The SWLRT is a proposed light rail line that would run through the cities of Eden Prairie, Minnetonka, Hopkins, and St. Louis Park, and end in downtown Minneapolis. (*Id.* ¶ 21.) The SWLRT project will receive some of its funding from the federal Capital Investment Program, which is administered by the Federal Transit Administration ("FTA"). (Aff. of Nani Jacobson ("Jacobson Aff.") ¶ 4, May 22, 2015, Docket No. 14.)

The two parcels of land at issue include land owned by the City of Minnetonka, which is subject to a restrictive covenant of "parkland and open space," and land located west of Claremont Apartments, with a public easement for use as a public recreational trail. (*See* Jacobson Aff., Ex. 2.) Plaintiffs describe the land as "approximately 49-acres of open space that consists of wooded areas, wetlands and trails." (Compl. ¶ 16.) The

area is classified as "open space" in Minnetonka's comprehensive plan, and the trails are represented as part of the Minnetonka's "Parks, Open Space and Trails Plan." (*Id.*) Plaintiffs allege that these Opus Hill properties qualify as Section 4(f) land. (*Id.* ¶ 64.) The proposed SWLRT route follows an existing trail near Claremont Apartments. (Affidavit of Jim Alexander ("Alexander Aff.") ¶ 8, May 22, 2015, Docket No. 13.) Under the current plan, parts of the existing trail would be relocated during construction, but then restored after completion. (*Id.* ¶ 10.) The proposed light rail would be "double-railed" and pass within 90 feet of the apartments. (Compl. ¶ 20.)

## II.     ENVIRONMENTAL REVIEW AND MUNICIPAL CONSENT

An environmental impact statement ("EIS") is required for the SWLRT project under NEPA because it "is a major governmental action that has the potential to cause significant environmental effects." (Compl. ¶¶ 23.) In January 2009, environmental review for the SWLRT project began when the Hennepin County Regional Railroad Authority published a Scoping Summary Report. (*Id.* ¶ 29.) The report "identified four LRT alternative alignments which – along with an Enhanced Bus service option – would be evaluated in a Draft Environmental Impact Statement." (Jacobson Aff. ¶ 11.) The Draft Environmental Impact Statement ("DEIS") was published in October 2012. (Compl. ¶ 32.) Route 3A was selected as the Locally Preferred Alternative. (*Id.* ¶ 34.) The DEIS included a draft Section 4(f) evaluation assessing historic properties and public

areas affected by the proposed SWLRT route.  (*Id.* ¶ 33.)  The report did not include either of the Opus Hill properties as Section 4(f) property.  (*Id.*)

In July 2013, Met Council and the FTA announced that they planned to evaluate the environmental impacts of proposed changes to the preferred route in a Supplemental Draft Environmental Impact Statement ("SDEIS").  (*Id.* ¶ 37.)  In August 2013, SFI wrote to Met Council to express concerns about the SWLRT and to request that the SDEIS include a Section 4(f) analysis of the Opus Hill properties.  (*Id.* ¶ 38.)  At a June 10, 2014, meeting at the SWLRT Project Office, SFI also "proposed an alternative route around the Claremont Apartments."  (*Id.* ¶ 39.)  Met Council rejected the proposal and informed SFI that the SDEIS would not include a Section 4(f) analysis of the Opus Hill area.  (*Id.* ¶¶ 39-40.)

Minnesota's Municipal Consent Statute requires that Met Council provide "the physical design component of the preliminary design plans" to affected local governments; the local government must then hold a public hearing and either approve or reject the proposal.  (*Id.* ¶ 41 (citing Minn. Stat. § 473.3994).)  Failing to approve or disapprove the proposal within 45 days is treated as an approval, unless Met Council grants an extension.  (*Id.*)  After holding a public hearing, Minnetonka approved the SWLRT proposal on June 23, 2014.  (*Id.* ¶¶ 42-43.)  The other five local governments involved in the SWLRT project also approved the proposal.  (*Id.* ¶ 44.)

On August 25, 2014, Met Council approved entering into a MOU with Minnetonka. (Aff. of Gary A. Van Cleve ("Van Cleve Aff."), Ex. 2 at 14, July 10, 2015,

Docket No. 22.)  In September 2014, Minnetonka agreed to the MOU.  (Second Aff. of Jim Alexander ("Second Alexander Aff."), Ex. 4 at 15-17, July 31, 2015, Docket No. 25.) The MOU states that it "memorializes the Parties' present intentions and understandings" and that it "does not limit the alternatives or mitigative measures that the Council may undertake in the development and construction of the SWLRT Project."  (*Id.* at 16.) Minnetonka's comments to the MOU mentioned the covenant on one of the Opus Hill properties, noting that it restricted use to "parkland and open space purposes," and stating that appropriate approvals would have to be obtained from Minnetonka and other relevant parties when "agreements are being entered into."  (Van Cleve Aff., Ex. 2 at 10.)

On May 21, 2015, the SDEIS was published, beginning a 45-day public comment period; Met Council and the FTA planned to release a Final Environmental Impact Statement ("FEIS") in early 2016.  (Jacobson Aff. ¶¶ 17-18.)  After this publication, the FTA would determine if the FEIS met NEPA requirements, and if so, issue a record of decision approving it; Met Council would determine if the FEIS met the requirements of the Minnesota Environmental Policy Act and, if so, issue its "Adequacy Determination." (*Id.* ¶ 19.)  However, this schedule appears to have changed – after the filing of this lawsuit, Met Council revised the scope of the SWLRT project.  (Second Alexander Aff. ¶¶ 3-4.)  On July 23, 2015, Met Council approved initiating another round of municipal consent to consider the changes.  (*Id.* ¶ 5.)  Met Council reported at the hearing on this motion that the new round of municipal consent had finished, with all cities consenting, but no new MOUs.

## III. THIS LITIGATION

Plaintiffs filed the instant action on March 30, 2015, seeking declaratory and injunctive relief pursuant to NEPA, Section 4(f), and the Municipal Consent Statute. (Compl. ¶ 1.) First, Plaintiffs allege that Met Council violated NEPA by selecting a particular design and initiating the municipal consent process prior to a record of decision approving a FEIS and without conducting a Section 4(f) analysis of the two Opus Hill properties. (*Id.* ¶¶ 46-55.) Second, Plaintiffs allege that Met Council violated Section 4(f) by failing to consider the Opus Hill properties. (*Id.* ¶¶ 56-69.) Third, Plaintiffs allege that Met Council violated the Municipal Consent Statute by engaging in the municipal consent process with a DEIS that did not include a Section 4(f) analysis of the Opus Hill area. (Compl. ¶¶ 70-80.) On May 22, 2015, Met Council moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim.

## DISCUSSION

### I. STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *See, e.g.*, *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir.2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"

*Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp.*, 550 U.S. at 555 (internal quotation marks omitted). Rule 12(b)(6) also authorizes the Court to dismiss a claim on the basis of a dispositive legal issue. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims. *Uland v. City of Winsted*, 570 F. Supp. 2d 1114, 1117 (D. Minn. 2008). It is the plaintiff's burden to establish that jurisdiction exists. *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990). In deciding a facial attack "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* at 729 n.6 (citations omitted).

## II.    NEPA CLAIM

NEPA requires federal agencies to consider the environmental impacts and prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995) (quoting 42 U.S.C. § 4332(2)(C)). The parties do not dispute that the SWLRT project is a major governmental action that requires preparation of an EIS under NEPA. (*See*

Compl. ¶ 47; Def.'s Mem. in Supp. of Mot. to Dismiss at 2, May 22, 2015, Docket No. 12.) Federal regulations prohibit any actions concerning a proposal that would "(1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a). However, § 1506.1 also states that it "does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance." *Id.* § 1506.1(d). Additionally, federal regulations permit an agency to choose a preferred alternative and indicate as much in the DEIS. *Id.* § 1502.14(e) (noting that an EIS may "[i]dentify the agency's preferred alternative or alternatives"). Nevertheless, NEPA does not allow for an agency to "predetermine" or "irreversibly and irretrievably commit[]" itself to the route before environmental review is complete. *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010); *Lakes and Parks All. of Minneapolis v. Metro. Council ("LPA II")*, No. 14-3391, 2015 WL 4635934, at *7 (D. Minn. Aug. 4, 2015).

NEPA generally does not provide an independent cause of action, and judicial review is typically limited to review after final agency action under the Administrative Procedure Act ("APA"). *See Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006). However, a narrow cause of action exists under NEPA against a state or local actor that is taking action prior to the completion of final federal environmental review which may "eviscerate the federal remedy." *LPA I*, 91 F. Supp. 3d at 1124 n.13. Met Council's arguments against recognition of this limited cause of action were already

rejected by this Court in *LPA I*, and thus, the Court will not address them again here.[1] Rather, the Court will consider whether Plaintiffs' claims fall within the cause of action described in *LPA I*.

This analysis, pursuant to 40 C.F.R. § 1506.1(a), involves "an examination of whether state or local action will limit the alternatives considered during environmental review and thereby 'eviscerate' any chance of obtaining a federal remedy under NEPA and the APA, because the state or local actor will have taken action that will be impossible for a plaintiff to reverse by later suing a federal actor." *LPA I*, 91 F. Supp. 3d at 1124 n. 13. The critical issue then is whether Plaintiffs have plausibly alleged that Met Council "irreversibly and irretrievably" committed to a particular route, *LPA II*, 2015 WL 4635934, at *8 (quoting *Forest Guardians*, 611 F.3d at 714), or undertook some action that "will limit the alternatives considered during environmental review" and "eviscerate any chance of obtaining a federal remedy." *LPA I*, 91 F. Supp. at 1124 n.13 (internal quotation marks omitted).

Plaintiffs allege that Met Council violated NEPA by selecting a particular design and initiating the municipal consent process. (Compl. ¶ 51.) Plaintiffs rely on *LPA I* to argue that because the municipal consent process occurred prior to final environmental

---

[1] Met Council's arguments against recognizing an implied cause of action under NEPA include: (1) NEPA actions are allowed only through APA review after final agency action or to enjoin states from taking action to implement a project until NEPA has been met; (2) an injunction is unnecessary and contrary to the process for judicial review established by Congress; (3) *Limehouse* is inapplicable in this procedural context, and (4) *Limehouse* is inconsistent with Eighth Circuit precedent. This Court already rejected these arguments in *LPA I*. *See* 91 F. Supp. 3d at 1120-24.

review they have sufficiently stated a claim under NEPA.  However, in *LPA I*, this Court relied on the LPA's specific allegations regarding Met Council's negotiations and MOUs, not just the municipal consent process.  91 F. Supp. at 1129 (finding that the LPA made "significant allegations," including "that the Council has led a municipal consent process and spearheaded negotiations with specific cities"); *id.* at 1130 ("[T]he Court finds that the LPA's allegations regarding the Met Council's negotiations, which have led to municipal consent, memoranda of understanding, negotiations and agreements with other entities, and pride pronouncements by Met Council officials and local decision makers, are enough to show predetermination.").  NEPA anticipates some preapproval with state and local bodies, 40 C.F.R. § 1506.1(d), and the Municipal Consent Statute anticipates that the design plan may change after initial approval.  Minn. Stat. § 473.3994, subd. 5 (describing the process to obtain subsequent approval "[i]f the final design plans incorporate a substantial change after the preliminary design plans").  Thus, the Court finds that Plaintiffs' allegations that Met Council complied with the municipal consent process alone are not sufficient to show irreversible commitment to a particular route or an evisceration of a federal remedy.

Second, Plaintiffs argue that Met Council's actions pursuant to the Municipal Consent Statute here are the same as the actions described in *LPA I*.  Specifically, they argue that this case also involves the municipal consent process, negotiations between a city and Met Council, and a specific route with an accompanying MOU.  Despite these general similarities, the Court finds that Plaintiffs have not pled sufficient facts to state a

plausible claim that Met Council "irreversibly and irretrievably" committed to the proposed route. In contrast to *LPA I*, Plaintiffs do not allege that Met Council engaged in contested negotiations or announced an agreement to a certain route. *See* Am. Compl. ¶ 35, *LPA I*, 91 F. Supp. 3d 1105 (No. 14-3391). Rather, Plaintiffs essentially describe the municipal consent process – a public hearing and approval – and allege that these events occurred. (Compl. ¶¶ 41-44.) Plaintiffs' complaint does not even reference the MOU between Minnetonka and Met Council; this document was disclosed in affidavits and exhibits from both parties. (Van Cleve Aff. ¶ 3; *id.*, Ex. 2; Second Alexander Aff. ¶ 6; *id.*, Ex. 4.) Nonetheless, the Minnetonka MOU does not contain any language suggesting the parties foreclosed other options.[2] Instead, it generally describes an agreement to work cooperatively, and it recognizes that review is ongoing. (*See* Second Alexander Aff., Ex. 4 at 16.)

Finally, recent events lend credence to Met Council's argument that it has not impermissibly committed to a route. In July 2015, Met Council revised the scope of the

---

[2] As discussed above, the MOU with Minnetonka states that it "memorializes the Parties' present intentions and understandings regarding Minnetonka's comments and the Council's responses to those comments." (Second Alexander Aff., Ex. 4 at 16.) It describes that the process and different types of review are ongoing. (*Id.* ("This MOU does not limit the alternatives or mitigative measures that [Met] Council may undertake in the development and construction of the SWLRT Project.").) The only apparent agreement was to work cooperatively to address the issues set forth by Minnetonka in its comments. (*Id.*) The Minnetonka MOU did not have any language similar to the St. Louis Park MOU discussed in *LPA I*, which stated that "no further study of the feasibility of rerouting freight traffic to the MN & S Route in St. Louis Park will be undertaken, except as required for any continuing environmental review of the SWLRT project." 91 F. Supp. 3d at 1114.

SWLRT, which included shortening the overall length of the line. (*Id.* ¶¶ 3-4.) As a result, Met Council initiated a new round of municipal consent, (*id.* ¶ 5), which, according to Met Council's representation at the hearing on this motion, resulted in approval. While not determinative, these recent changes to the scope of the route suggest that the route is not final.

Based on the foregoing, the Court will dismiss Plaintiffs' NEPA claim for failure to state a claim. Plaintiffs have failed to allege sufficient facts suggesting that Met Council either impermissibly committed to a particular route prior to final environmental review or undertook some other action that would unduly limit the alternatives considered during environmental review.[3]

## III.   SECTION 4(F) CLAIM

Plaintiffs bring a claim under Section 4(f), arguing that the Opus Hill properties were improperly excluded from Section 4(f) review. While NEPA is "essentially procedural," *see LPA II*, 2015 WL 4635934, at *6 (quoting *Vt. Yankee Nuclear Power Corp., v. NRDC*, 435 U.S. 519, 558 (1978)), "Section 4(f), in contrast, imposes a substantive mandate." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1158 (9th Cir. 2008). Section 4(f) prohibits the use of federal funds for any

---

[3] Because the Court finds that Plaintiffs have not alleged sufficient facts suggesting that Met Council impermissibly committed to a route, it need not discuss whether committing to a particular route without complete Section 4(f) analysis would also violate NEPA.

transportation project "requiring the use of publicly owned" park lands or historic sites, unless "there is no prudent and feasible alternative," and the "project includes all possible planning to minimize harm . . . resulting from the use."  49 U.S.C. § 303(c).  The requisite Section 4(f) analysis can be included in the EIS or other documents.  23 C.F.R. § 774.7(f).

Section 4(f) generally does not provide an independent cause of action.  *See, e.g.*, *Valley Cmty. Pres. Com'n v. Mineta*, 373 F.3d 1078, 1084 (10th Cir. 2004) ("As Section 4(f) does not provide an independent cause of action, judicial review is available only through [the] Administrative Procedure Act."); *Tahoe Tavern Prop. Owners Ass'n v. U.S. Forest Serv.*, No. S06-407, 2007 WL 1279496, at *5 (E.D. Cal. Apr. 30, 2007) (finding no independent cause of action under NEPA or Section 4(f)).  Plaintiffs argue that the Court should recognize an implied cause of action under Section 4(f) similar to the implied NEPA cause of action against a state actor.  In *LPA I*, this Court found that given the circumstances, Congress would not have intended "for a major transit project to escape full and thorough NEPA review because . . . NEPA offered no cause of action against a state actor working in tandem with the federal government."  91 F. Supp. 3d at 1125.  Plaintiffs argue that this rationale applies equally to their Section 4(f) claim.  Plaintiffs cite a Section 4(f) regulation, which states that "[t]he potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study."  23 C.F.R.

§ 774.9(a). Based on this language, Plaintiffs argue that failure to allow an implied cause of action here would render Section 4(f) review meaningless.

However, the Court finds that many of the factors that supported a NEPA cause of action in *LPA I* are not present in the Section 4(f) context. First, in *LPA I*, this Court relied on the "narrow, unique, and limited cause of action arising under NEPA," as recognized in *Limehouse*, a case which included no mention of Section 4(f). 91 F. Supp. 3d at 1122. Plaintiffs have not cited to any cases that recognize a similar cause of action under Section 4(f). Additionally, this Court relied on the NEPA regulation prohibiting any action that would "[l]imit the choice of reasonable alternatives." 91 F. Supp. 3d at 1124 n.13 (alteration in original) (finding that the LPA's claim arose under 40 C.F.R. § 1506.1(a)). This Court stated that the cause of action under NEPA was not a broad one, but rather, that it was "tied to the regulation under which it was brought and the particular facts of [the] case." *Id.* at 1124 (citation omitted). Here, even if the facts are somewhat similar, Section 4(f) is distinguishable. The only textual hook for a similar cause of action within Section 4(f) is the command that Section 4(f) properties "shall be evaluated as early as practicable . . . when alternatives to the proposed action are under study." 23 C.F.R. § 774.9(a). However, this language does not suggest that certain actions are prohibited before final environmental review. NEPA, in contrast, does prohibit limiting the choice of reasonable alternatives prior to final environmental review. Lastly, Section 4(f) does not have the same doctrine of predetermination, which provides a standard for NEPA cases. *See Forest Guardians*, 611 F.3d at 713-14.

Overall, because of these differences between NEPA and Section 4(f), the Court will not recognize an implied cause of action under Section 4(f) prior to final agency action. Accordingly, the Court will dismiss Plaintiffs' Section 4(f) claim for lack of jurisdiction; as required by the APA, Plaintiffs cannot bring a claim until after final agency action. *See* 5 U.S.C. § 704; *Weinberger v. Salfi*, 422 U.S. 749, 766 (1975) (finding that the finality requirement is jurisdictional).

## IV.   MUNICIPAL CONSENT CLAIM

Plaintiffs allege that Met Council violated the Municipal Consent Statute by engaging in the municipal consent process with a DEIS that failed to include a Section 4(f) analysis of the Opus Hill area.[4] (Compl. ¶ 74.) However, in *LPA II*, the Court found that the most reasonable interpretation of the Municipal Consent Statute is that it does not require a DEIS before the municipal consent vote. *LPA II*, 2015 WL 4635934, at *14. The Municipal Consent Statute only requires that the city have access to "the physical design component of the preliminary design plans" before voting. Minn. Stat. § 473.3994, subd. 3. The statute does not define the "physical design component," but reading the phrase together with the definition of the "preliminary design plans" and "preliminary engineering plan," the Court found that under the most reasonable reading

---

[4] Even though Plaintiffs' complaint appears to argue that no DEIS was publicly available prior to the municipal consent process, (Compl. ¶ 73), Plaintiffs admit that the DEIS was released to the public in October 2012 and that Minnetonka's public hearings on the matter took place in June 2014. (*Id.* ¶ 42.) Accordingly, Plaintiffs likely only argue that the DEIS was insufficient because it lacked a Section 4(f) analysis of the Opus Hill area. (*See id.* ¶ 74.)

of the statute, failing to provide a DEIS before the vote is not a violation of the statute. *LPA II*, 2015 WL 4635934, at *13-14.

Here, Plaintiffs makes the same argument, noting that a "preliminary or draft environmental impact statement" is part of the preliminary design plan. (Compl. ¶ 41.) However, the Municipal Consent Statute does not require the presentation of a full preliminary design plan; rather, it requires that Met Council submit "the physical design component of the preliminary design plans." Minn. Stat. § 473.3994, subd. 3. Just as in *LPA II*, the most reasonable reading of the statute is that a DEIS is not required. *See LPA II*, 2015 WL 4635934, at *13-14. Accordingly, Plaintiffs have failed to state a claim for a violation of the Municipal Consent Statute, as a DEIS and Section 4(f) analysis[5] are not required by the statute. The Court will therefore dismiss this claim.

## CONCLUSION

In sum, Plaintiffs have failed to state claims under NEPA and the Municipal Consent Statute, and the Court lacks jurisdiction over Plaintiffs' Section 4(f) claim prior to final agency action. Unlike in *LPA I*, Plaintiffs' allegations are not sufficient to suggest that Met Council irreversibly committed itself to a route before final environmental review. However, regardless of the limitation on judicial review prior to

---

[5] The parties dispute whether a complete DEIS must include Section 4(f) analysis. However, nothing indicates, and Plaintiffs do not argue, that Section 4(f) analysis would be required even if a DEIS was not. Therefore, the Court need not consider that alternative. Because a DEIS is not required under the Municipal Consent Statute, Section 4(f) analysis is also not required.

final agency, Met Council would be wise to ensure that it complies with all environmental review restrictions from the onset of a project.  If Met Council foregoes the necessary environmental review, even if unreviewable at the time, it does so at its own risk.  After final agency action, NEPA and Section 4(f) must be satisfied, and the costs of remedying such oversights only grow as a project develops.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's Motion to Dismiss [Docket No. 10] is **GRANTED.**  Plaintiffs' claims are **DISMISSED without prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  February 25, 2016            _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                     JOHN R. TUNHEIM
                                                            Chief Judge
                                                  United States District Court